# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>vs. )<br>)<br>CANDELARIO FAVELA-ROJO, *et al.,* )<br>)<br>Defendants. ) | NO. CR-11-0233-HE |

## ORDER

Defendant Candelario Favela-Rojo, Jose Salvador Torres and Alvaro Castillo-Delgado are charged in a sixteen count superseding indictment with conspiracy to possess with intent to distribute and to distribute methamphetamine and other crimes. Favela-Rojo is also charged with maintaining a drug-involved premises, Torres is charged with one count of unlawful use of a communication facility to distribute methamphetamine and one count of possession of methamphetamine with intent to distribute, and Castillo-Delgado is charged with conspiracy to money launder, one count of distribution of methamphetamine and one count of unlawful use of a communication facility to distribute methamphetamine.

Defendants Favela-Rojo and Torres have filed motions seeking to suppress all communications and evidence obtained from four court-authorized wiretaps.[1] Defendant Castillo-Delgado has joined in both motions. Having considered the parties' briefs, the wiretap applications, supporting affidavits and authorizing orders, the court concludes

---

[1] Defendant Torres' motion only pertains to the January 31, 2011, wiretap and its extension.

defendants' motions to suppress should be denied.[2]

In late summer of 2010, federal law enforcement officers began investigating a drug trafficking organization that was operating in several states. After various traditional investigative techniques had been used, Drug Enforcement Administration ("DEA") agents in Oklahoma decided to seek a wiretap. A wiretap application was submitted on January 31, 2011, and an application to extend that wiretap was submitted on March 14, 2011. A wiretap on a second phone was sought on April 8, 2011. As that phone was discarded before any calls were intercepted, an application relating to the replacement phone was submitted on April 25, 2011. Orders were entered authorizing the wiretaps and the extension. Defendants challenge the sufficiency of the applications supporting the applications in their motions to suppress.

Title III governs the use of wiretaps and evidence obtained from their use. United States v. Radcliff, 331 F.3d 1153, 1160 (10th Cir. 2003). Once a district court authorizes a wiretap it is presumed valid. *Id.* Defendants bear the burden of proving the wiretaps' invalidity. *Id.*

Defendants contend the applications were deficient in that the supporting affidavits failed to establish the wiretaps were "necessary," as required by Title III of the Omnibus Crime Control and Safe Streets Act of 1968. 18 U.S.C. §§ 2510-2522. All wiretap applications must include "a full and complete statement as to whether or not other

---

[2]*A hearing on the suppression motions is unnecessary as they raises only legal issues. See United States v. Serrano, 209 Fed.Appx. 796, 799 (10th Cir. 2006) (unpublished).*

investigative techniques have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).[3] The issuing judge must then find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id.* at § 2518(3)(c). This "necessity requirement" is "'designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" United States v. Foy, 641 F.3d 455, 464 (10th Cir. 2011) (quoting United States v. Kahn, 415 U.S. 143, 153 n. 12 (1974)), *cert. denied*, ___ U.S. ___ (2011). While investigating officers are not required to "'exhaust all other conceivable investigative procedures before resorting to wiretapping,'" *id.* (quoting United States v. Zapata, 546 F.3d 1179, 1185-86 (10th Cir.2008)), they "must explain the need for wiretaps with some degree of specificity." *Id.* Defendants claim the government essentially admits in the affidavits that traditional investigative techniques had been effective. They question whether the wiretaps were needed when the government had already acquired a substantial number of witnesses and large amount of intelligence regarding the drug trafficking organization through the use of conventional investigative methods.

January 31, 2011 Wiretap

The January 31, 2011 wiretap intercepted calls on codefendant Fidencio Castillo-

---

[3]*"Traditional investigative techniques include: (1) standard surveillance; (2) questioning and interrogating witnesses or suspects, including through the use of grand jury proceedings; (3) search warrants; (4) infiltration of criminal groups by confidential informants and undercover agents; (5) pen registers; and (6) trap and trace devices." United States v. Foy, 641 F.3d 455, 464 (10th Cir. 2011), cert. denied, ___ U.S. ___ (2011).*

3

Delgado's cell phone. Defendants assert the affidavit of DEA Special Agent Tyler Birdwell, which supported the January wiretap application, used conclusory language in explaining why other investigative procedures would fail,[4] demonstrated that some of the goals sought to be accomplished by the wiretap were already being attained through traditional investigative methods, and failed to specifically relate his statements to the individuals targeted by the wiretap.

The court has reviewed the agent's affidavit and finds it sufficient to support the judge's conclusion that the wiretap was necessary. The affiant explained "why each traditional investigative technique had either been ineffective in this particular case or why the officer[] believed such techniques would be ineffective or dangerous." Foy, 641 F.3d at 464.

Defendants focus on the agent's discussion of four traditional investigative techniques – the use of confidential sources and sources of information, controlled purchases, physical surveillance and undercover agents. Initially they claim Agent Birdwell not only made the conclusory assertion that confidential sources would only be of limited assistance, but contradicted himself, as he admitted that a confidential source ("CS") had been successfully used in Las Vegas, Nevada. However, what the agent related in the affidavit was that, while the CS had enabled the agents to identify Mario Meza-Lopez, a member of the trafficking

---

[4]*The affidavits contain some generalized statements or assertions about problems with using normal investigative techniques when investigating a complex drug trafficking organization. However, they also include specific information applying the generalities to the underlying investigation.*

organization in Nevada, and had arranged for an undercover officer to purchase methamphetamine from him, the CS was unable to identify Meza's source of supply, knowing only that he obtained the drugs from Arizona. The CS was not able to provide any other information regarding the activities of the drug trafficking organization in Kansas, Oklahoma City or elsewhere. The information provided by a source in Topeka was similarly limited.

The agent noted that the DEA office in Oklahoma City was completely unaware of Castillo's alleged involvement in the drug organization until some of his phone calls were intercepted by Kansas DEA agents. The agent stated that not only did local agents not have any sources who could provide information regarding Castillo[5] or the organization, he believed that any attempt to develop a source would alert the members of the organization to the investigation.

While defendants claim the agent failed to explain why Oklahoma City law enforcement did not even try to develop local sources of information, the court finds it was reasonable for the officers to conclude that they would have no more success using confidential sources than agents had had in Nevada or Kansas. Agent Birdwell explained that one of the main problems with attempting to break into complex drug trafficking organizations is that they are specifically structured to avoid detection. Birdwell January

---

[5]The agent stated that "[c]urrently agents in Oklahoma City, Oklahoma and Topeka, Kansas, have no CSs or SOIs able to introduce an undercover agent to **CASTILLO, CASTRO,** or other members of this DTO." Birdwell January affidavit, ¶96.

affidavit, ¶82 ("It is common in a complex DTO [drug trafficking organization], such as the DTO being investigated, for some members of the conspiracy not to know one another and not to know all the details of how the DTO operates."). As the government noted and the wire application affidavits substantiated, the bulk of the information obtained about the drug trafficking organization came through the use of wiretaps in Arizona, Nevada and Kansas, not from confidential sources.

As for defendants' claim that the investigators should have attempted to obtain information through controlled purchases, they erroneously assert that the buys the affiant discusses were in Phoenix, when they occurred in Nevada, and again ignore that it was not the buys in Las Vegas that provided information regarding the trafficking organization in Nevada or elsewhere, but the wiretaps that were obtained because of the buys.

Although defendants discounted the reasons given for the decision not to use undercover agents in the Oklahoma investigation, Agent Birdwell explained that an undercover officer in another state had only been minimally successful. Citing his training and past experience, the agent also discussed the dangers involved in going undercover and why an undercover agent could not reasonably be expected to succeed.[6]

---

[6]*Agent Birdwell explained that another problem with attempting to use an undercover agent was that DEA agents in Oklahoma and Kansas did not have a confidential source who could introduce such an agent to the organization. Defendants assert that "Agent Birdwell [did] not say that any effort [had] been made to develop local confidential sources or why the development of such sources would be unsuccessful in investigating this alleged DTO." Defendants' brief, p. 13. They overlook the agent's statement that attempting to develop a local source would risk exposing the investigation. Developing a source would appear to be more difficult in a situation such as occurred here, where the local DEA office lacked any knowledge of, or information about, the organization until advised of its existence by authorities outside the state and also knew nothing*

> [M]ost high-level illegal drug traffickers and money laundering organizations are extremely exclusive in determining with whom they will conduct, or even discuss, illegal drug activities. Due to the close and secretive nature of the organizations, it is both highly unlikely and very dangerous for undercover agents to attempt to infiltrate the upper echelons of such organization.

Birdwell Affidavit, ¶ 97. In <u>United States v. Verdin-Garcia</u>, 516 F.3d 884 (10th Cir. 2008), the Tenth Circuit recognized the dangers involved in undercover narcotics work. The court stated that it was "keenly aware that '[i]nfiltration of a criminal organization is extremely dangerous and is used sparingly by most law enforcement agencies.'" *Id.* at 891 (quoting Gregory D. Lee, Global Drug Enforcement: Practical Investigative Techniques 116 (2004)). The court concludes the government met its burden of showing that any attempt to infiltrate the drug trafficking organization would be both unlikely to succeed and dangerous.

Finally, the court is not persuaded that the agent failed to explain adequately why physical surveillance would not suffice as an investigative technique. Agent Birdwell stated that long-term physical surveillance of Castillo's residence was not an option because neighbors would be suspicious of new people or vehicles that were parked in the area for an extended period of time. He said officers had considered trying to watch the residence from a neighboring high school, but rejected that option for several reasons, including that it would entail informing the school staff and risk exposing the investigation. The limitations of relying on physical surveillance, alone, also were discussed, as were the benefits of using

---

*about some of the targets. Agents could not locate any criminal history for several members of the organization, including Castillo.*

that technique in conjunction with another investigative tool, such as a wiretap.[7] *See id.* at 890 ("visual surveillance, however successful, cannot do much to establish the relationships between the investigation's subjects, the structure of their organization, the purposes of meetings, or the sources of their drug supply").

Defendants did not challenge the agent's explanation as to why other methods of surveillance would not work. Nonetheless, the court finds the affidavit demonstrated why search warrants would be premature,[8] why the use of grand jury subpoenas and suspect interviews would not be productive,[9] that trash pulls had occurred but been of limited success and risked exposure of the operation, and that other standard investigative techniques, such as pen registers,[10] a pole camera, and GPS tracking systems, would not accomplish the goal

---

[7]*Officers had used an electronic locator to track Castillo but, the agent noted, that tool had its limitations, particularly with respect to accuracy of location and the time within which the location data could be provided.*

[8]*The officers had identified some, but not all, members of the drug trafficking organization and had located some, but not all, locations in Oklahoma City and Topeka that they believed to be associated with it. The agent stated that the execution of search warrants would risk exposure of the multi-state trafficking organization, rather than "reveal the total scope of the illegal operation and the identities of the coconspirators." He stated that "to successfully identify and dismantle the entire organization, it is preferable to delay any search warrants until agents are prepared to arrest all of the key members of the organization." Birdwell affidavit, ¶¶ 101-02. See <u>Verdin-Garcia</u>, 516 F.3d at 891.*

[9]*The agent explained that targets, if subpoenaed before the grand jury, would most likely be uncooperative and claim their Fifth Amendment privilege and they, as well as other suspects who were interviewed, would inform others of the investigation. See id.*

[10]*The agent discussed in the affidavit why pen registers and toll record analyses, although valuable investigative tools, would not by themselves achieve the goals of the investigation. They did not identify all the parties to the call or indicate the substance of the conversation. See <u>United States v. Ramirez–Encarnacion</u>, 291 F.3d 1219, 1223 (10th Cir.2002) ( "the identity of many of the conspirators and the full extent of the conspiracy remained unknown" despite the use of pen*

of the investigation – to identify all coconspirators and their roles in the organization. The officer's statements in the affidavit were "'factual in nature and ... specifically relate[d] to the individuals targeted by the wiretap.'" Foy, 641 F.3d at 464 (quoting United States v. Cline, 349 F.3d 1276, 1281 (10th Cir.2003)).[11]

The Tenth Circuit has "held on numerous occasions that the law enforcement goal of uncovering the size and scope of the conspiracy may justify the authorization of wiretaps." Foy, 641 F.3d at 464-65. The object of the investigation here was "to dismantle the organization as a whole." Birdwell affidavit, ¶98. Wiretap authorizations have been upheld repeatedly by the Tenth Circuit in similar circumstances. *See* United States v. Ramirez–Encarnacion, 291 F.3d 1219, 1221-24 (10th Cir.2002); Zapata, 546 F.3d at 1185-88. The court concludes the government sufficiently explained why the January 31, 2011, wiretap was necessary. Defendant's motion to suppress, insofar as it pertains to the January 31, 2011, wiretap will be denied.

March 14, 2011, Wiretap

Defendants challenge the March 14, 2011 wiretap[12] by reasserting some of their criticisms of the initial wiretap application. They claim Agent Birdwell, in his supporting

---

*registers).*

[11]*It is apparent from the case law and the affidavit that many standard investigative techniques, such as the use of grand jury subpoenas and subject interviews or arrests, often are not effective when the crime being investigated involves a complex, compartmentalized drug trafficking organization.*

[12]*This was an extension of the January 31, 2011, wiretap.*

9

affidavit, "gives no information as to why DEA cannot develop local confidential sources to gather information on the local members of the alleged DTO." [13] Defendants' motion, p. 16. Defendants fail, though, to demonstrate that something had changed in the interim to make it feasible for the Oklahoma City agents to develop a confidential source or source of information who could assist them. The affidavit demonstrated that confidential sources were not an effective investigative tool because of the type of organization being investigated. As the agent explained, his experience was that confidential sources normally can only provide limited information when the subject drug organization is complex and compartmentalized, and that is what happened with the sources investigating agents had actually used in Las Vegas and Topeka.[14]

Defendants correctly assert that Agent Birdwell's explanation as to why an extension

---

[13]*Defendants also assert the application does not show why the local DEA office could not have conducted its investigation by using controlled purchases and physical surveillance. However, the agent specifically noted that "[t]he observations by surveillance officers on February 22, 2011, alone would not have the same implication if the wire interception of [target telephone #1] were not available." Birdwell March affidavit, ¶ 72. Also, DEA agents learned that individuals involved in the drug organization were aware they were being followed. Id. at ¶¶ 69,73. The targeted individuals' awareness of police surveillance made it more difficult for the officers to conduct physical surveillance and increased the risks associated with using undercover agents.*

[14]*On approximately February 27, 2011, DEA agents learned that Homeland Security Investigations, the Federal Bureau of Investigations and the Oklahoma City Police Department were investigating Tomas Colorado (the target of the April wiretap applications) and had been working with a confidential source ("CS") who had purchased methamphetamine from Colorado. The CS had been arrested for possession of methamphetamine in 2010, and since then had been cooperating with law enforcement. He had provided information in late October 2010, about Colorado's involvement in the trafficking operating, but was unable to provide "detailed and timely information and evidence concerning the shipments of controlled substances, shipments of drug proceeds, location of stash house or large quantities of controlled substances, and each co-conspirator." Spain affidavit, ¶78.*

of the January wiretap was needed was, in part, a reiteration of his first affidavit. However, in his March affidavit he details information officers obtained through a combined use of the January 31, 2011, wiretap and other standard investigative techniques, including physical surveillance, pen register information and GPX location data. He also explained why officers decided against interviewing certain individuals who had been arrested on charges unrelated to the methamphetamine investigation as that would "not accomplish the goal of dismantlement of the DTO." Birdwell affidavit, ¶ 84. Problems officers had had replacing batteries in GPS vehicle tracking systems also were related in the March affidavit. *Id.* at ¶ 98.

Defendants do not demonstrate a basis for concluding the agent's reasoning was no longer valid and the court can discern none. The court's prior discussion regarding the adequacy of the January 31, 2011, application applies here. Having concluded the government met its burden of showing that an extension of the January 31, 2011, wiretap was necessary, defendants' motion to suppress, insofar as it pertains to the March 14, 2011, wiretap will be denied.

April 8, 2011, Wiretap and April 25, 2011, Wiretap

The April 8, 2011, wiretap was to intercept calls on a cell phone used by Tomas Colorado. However, the government represents that no wire interceptions occurred because Colorado switched phones before the Title III intercept was activated. Government's response, p. 17; *see* Spain affidavit, ¶ 23. The April 25, 2011, wiretap intercepted calls on Colorado's replacement phone. Defendants assert that the application for each of those wiretaps "relied on information from Special Agent Tyler Birdwell of the DEA and

11

incorporated, by reference and as part of the Application, the affidavit of DEA Special Agent Shan Spain." Defendants' motion, pp. 18-19. The only comment they make with respect to the sufficiency of the April applications is: "[s]uffice it to say that each of the Applications claimed inability to use other means without ever demonstrating the validity of the claim." *Id*. at p. 19. More than a bald allegation of insufficiency is generally required for a defendant to challenge a wiretap. In the absence of any actual factual analyses of the challenged application by defendants, or any obvious basis for concluding the application and order failed to comply with the statutory requirements, the wiretap authorization order will be presumed valid. *See* Radcliff, 331 F.3d at 1160. Defendants' motion to suppress, insofar as it pertains to the April wiretaps, will be denied.

Accordingly, defendant Favela-Rojo's and Jose Torres' motions to suppress, joined in by defendants Castillo [Doc. No. 185, 189, 195] are **DENIED**.

**IT IS SO ORDERED**.

Dated this 25th day of October, 2011.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE